Leonard YOUNG, Plaintiff,

v.

Daniel WELYTOK and Jill Gilbert Welytok,
Defendants-Appellants,

AMERICAN STANDARD INSURANCE COMPANY,
Intervenor-Respondent.

Court of Appeals

*No. 2009AP3015. Submitted on briefs January 5, 2011.
—Decided April 5, 2011.*

2011 WI App 59

(Also reported in 798 N.W.2d 881.)

On behalf of the defendants-appellants, the cause was submitted on the briefs of *Rex R. Anderegg* of *Anderegg & Associates* of Milwaukee.

On behalf of the intervenor-respondent, the cause was submitted on the brief of *Terry J. Booth* of *Piper & Schmidt* of Milwaukee.

Before Curley, P.J., Fine and Kessler, JJ.

¶ 1. CURLEY, P.J.    Daniel Welytok and Jill Gilbert Welytok ("the Welytoks") appeal an order that, pursuant to *Novak v. American Family Mutual Insurance Co.*, 183 Wis. 2d 133, 142, 515 N.W.2d 504 (Ct. App. 1994) (holding that an insurer has no duty to defend its insured after it pays the policy's liability limit), grants American Standard Insurance Company (American Standard) summary judgment and dismisses American Standard from this case—a suit filed by Leonard Young against the Welytoks for damages resulting from an auto accident. The Welytoks argue that summary judgment is inappropriate because *Novak* is factually distinguishable and therefore does not apply. They also argue that numerous issues of fact preclude summary judgment, and that certain comments made by the trial court at the summary judgment hearing "purport[ed] to overrule decades of jurisprudence establishing certain reasonable duties an insurance company owes its insured, including a duty of good faith." We conclude that, under the plain language of the Welytoks' policy and under *Novak*, American Standard had no duty to defend the Welytoks after it paid Young the policy limits; moreover, the factual issues that the Welytoks raise neither distinguish *Novak* nor present any issue of material fact. Finally, the trial court's comments at the summary judgment hearing in no way altered American

Standard's duty of good faith, nor were they erroneous for any other reason. We therefore conclude that summary judgment and dismissal were appropriate and affirm.

## I. BACKGROUND.[1]

¶ 2.  In July 2006, the Welytoks' teenage daughter, Tara, and Leonard Young were involved in an automobile-motorcycle accident in which Tara collided with Young. Young, who was thrown off his motorcycle, fractured his left wrist and right hand, and consequently missed several weeks of work.

¶ 3.  The Welytoks were insured by American Standard. The Welytoks' policy had a bodily injury liability limit of $100,000 per person. This policy provided, in pertinent part:

> **We** will pay compensatory damages an **insured person** is legally liable for because of **bodily injury** . . . due to the use of a car . . . . **We** will defend any suit or settle any claim for damages payable under this policy as **we** think proper. HOWEVER, **WE** WILL NOT DEFEND ANY SUIT AFTER **OUR** LIMIT OF LIABILITY HAS BEEN OFFERED OR PAID.

(Bolding and capitalization in policy; some spacing omitted.)

¶ 4.  Although the Welytoks' policy had a limit of $100,000, American Standard initially mistakenly advised Young that the limit was actually $500,000. Young consequently sent American Standard a demand letter in July 2008 requesting $500,000 worth of damages.

---

[1] Some of the background facts in this case derive from an affidavit that was signed but not notarized. Neither party raises the issue of this affidavit's legitimacy on appeal.

The demand specified that the total amount of Young's current and future wage loss and current and future medical expenses stemming from the accident was approximately $108,000. The demand also explained that Young suffered damages of an unspecified amount due to the fact that he was, because of the accident, unable to ride his motorcycle—a hobby he avidly pursued for more than two decades—without "debilitating anxiety and physiological discomfort."

¶ 5. About a week after it received Young's $500,000 demand, American Standard clarified that the policy limits were in fact $100,000. American Standard then forwarded the Welytoks a letter warning that Young's claims may exceed their policy limits. That letter provided, in pertinent part:

> This letter is to advise you that the claim of Leonard Young is of such a nature that we feel the claim may exceed your policy limits. We are, therefore, advising you of the possible excess exposure that you may have for this claim. We would like to advise you that you may want to retain personal counsel of your own, to protect your interest above the $100,000.00 liability limits you were carrying with us at the time of the accident.
>
> You should also be aware that your policy provides that American Standard Insurance Company of Wisconsin will not defend any lawsuit after the company's limit of liability has been offered or paid. In the event that American Standard Insurance Company of Wisconsin decides to offer the limit of liability under the policy for settlement of this claim, it is no longer responsible to pay attorney's fees for your defense if a lawsuit is ultimately started. We will attempt to obtain a full release for you within your policy limits. However, we cannot guarantee such a result. In any event, we will obtain a release for you up to the limit of liability of your policy. If the claimant wishes to commence a

145

lawsuit against you, personally, to recover money beyond our policy limits, it will be necessary for you to make arrangements for your own defense at your own expense.

(Some capitalization omitted.)

¶ 6.  American Standard attempted to settle the case with Young for an amount within the $100,000 policy limit. To this end, it independently investigated and evaluated Young's claim. For example, an American Standard claims adjuster obtained a copy of the police report, interviewed Tara, and made several calls to someone who witnessed the accident. The adjuster also personally reviewed and analyzed Young's medical expenses, finding them to be approximately $25,000 less than what Young initially demanded. The adjuster also obtained documentation from Young's employer to verify wage loss. Additionally, in evaluating Young's claim, American Standard considered the medical records and the January 16, 2008 report of Young's treating physician. This report identified a permanent injury to Young's left wrist as a result of the accident, a condition which could require additional surgery. American Standard also considered a February 13, 2007 radiology report indicating that Young's wrist fracture "may well have failed to unite." American Standard also considered the records and report of Young's treating psychologist. This report diagnosed permanent psychological injuries to Young resulting from the accident.

¶ 7.  While American Standard was in the process of evaluating Young's claim and attempting to reach a settlement, Jill Welytok conversed with American Standard representatives about the case. According to Jill, one representative told her that it would be "too expensive" for American Standard to go to trial or otherwise dispute Young's claimed damages. This representative

also told Jill that American Standard had no obligation to confer with the Welytoks prior to any settlement. The representative further said that she had worked with Young's attorney for years, trusted his numbers, and expressed concern that American Standard could be subjected to a bad faith claim if they delayed payment while investigating Young's claim. According to Jill, another American Standard representative told her that American Standard preferred to pay Young the policy limits rather than spend what he estimated would be $40,000 to $50,000 on litigation costs to defend the claim.

¶ 8.  American Standard tried to settle Young's claim for an amount less than $100,000, but Young refused to do so. American Standard also offered its policy limit in exchange for a full release of American Standard and the Welytoks, including Tara. Young rejected that offer. Specifically, in a telephone conversation on September 24, 2008, Young's attorney told American Standard that Young would not accept anything less than $100,000, and that Young would sue if the policy limits were not offered. In response, American Standard decided to offer its $100,000 limit in exchange for a full release. Before offering the policy limit payment, the American Standard adjustor called Jill to advise her of American Standard's intentions to offer a policy limit payment in exchange for a full release. The adjustor explained, however, that a full release could not be guaranteed.

¶ 9.  On October 3, 2008, Young's attorney advised American Standard that Young was willing to accept the $100,000 payment, but would not release Jill from liability. Thereafter, American Standard paid its $100,000 policy limit to Young in exchange for a release of all claims against American Standard, a covenant not

to sue Tara, and a release of the Welytoks, including Tara, to the extent of the $100,000 payment.[2]

¶ 10. Five days later, Young forwarded a letter to American Standard revealing that his medical expenses were approximately $20,000 less than what had been represented in his initial demand.[3]

¶ 11. On December 5, 2008, Young filed suit against the Welytoks for the recovery of additional sums over and above the $100,000 already paid, alleging personal injury resulting from the automobile accident. Because American Standard had tendered the policy limits to Young, he did not name American Standard as a defendant. The Welytoks, acting *pro se*,[4] filed an answer and affirmative defenses.

---

[2] The Welytoks also claim that American Standard paid Young the policy limit without first informing them of its decision. However, viewing the record in the light most favorable to the Welytoks, as we are required to do on summary judgment, *see Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶ 23, 241 Wis. 2d 804, 623 N.W.2d 751, we find no support for this contention.

[3] The Welytoks also claim that Young's addendum letter, sent on October 30, 2008, also estimated Young's wage at twenty percent less than what it was estimated to be in the original demand. Viewing the estimated present and future wage loss in the initial demand as compared to wage loss totals presented in the October 30, 2008 addendum in the light most favorable to the Welytoks, as we are required to do on summary judgment, *see id.*, ¶ 23, we conclude that the figures for present and future wage loss did not change, and that they in fact remained the same. We also remind counsel that an appellant's failure to provide record citations that properly support the argument "violates WIS. STAT. RULE 809.19(1)(d)-(1)(e) and seriously hampers our ability to efficiently resolve the appeal." *See State v. Bergwin*, 2010 WI App 137, ¶ 18, 329 Wis. 2d 737, 793 N.W.2d 72.

[4] The Welytoks are both licensed to practice law in Wisconsin.

¶ 12.   On January 9, 2009, American Standard entered the action when it filed a motion to stay, intervene and bifurcate. American Standard intervened in the action for the sole purpose of seeking a judicial declaration that, having paid its policy limits, it had no further duty to defend the Welytoks for injuries allegedly sustained by Young. On March 26, 2009, the trial court granted American Standard's request to intervene.

¶ 13.   On July 27, 2009, American Standard filed a motion for summary judgment, requesting that the trial court dismiss it from the action and dismiss it from any further obligation to defend the Welytoks in the action. The trial court granted summary judgment in favor of American Standard, and the Welytoks now appeal.

## II. ANALYSIS.

■

¶ 14.   We review *de novo* the grant or denial of summary judgment, employing the same methodology as the circuit court. *See Smaxwell v. Bayard*, 2004 WI 101, ¶ 12, 274 Wis. 2d 278, 682 N.W.2d 923. We will affirm a summary judgment if no genuine issues of material fact exist and if the movant is entitled to judgment as a matter of law. *Novak*, 183 Wis. 2d at 136; WIS. STAT. § 802.08(2) (2009–10).[5] The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the party opposing the motion. *Lambrecht v. Estate of Kaczmarczyk*, 2001 WI 25, ¶ 23, 241 Wis. 2d 804, 623 N.W.2d 751. If there is any reasonable doubt regarding whether a genuine issue of material fact exists, that doubt must be resolved in

---

[5] All references to the Wisconsin Statutes are to the 2009–10 version unless otherwise noted.

149

favor of the nonmoving party. *Schmidt v. Northern States Power Co.*, 2007 WI 136, ¶ 24, 305 Wis. 2d 538, 742 N.W.2d 294.

■■

¶ 15.   Interpretation of an insurance policy provision also presents a question of law for which we owe no deference to the conclusions of the trial court. *See Novak*, 183 Wis. 2d at 136. We apply an objective test to the insurance contract, interpreting it as it would be understood by a reasonable person in the insured's position. *Id.*

¶ 16.   With these review standards and methodology in mind, we determine whether American Standard properly relieved itself of its duty to defend under the policy and under *Novak*, thereby allowing its dismissal from Young's claim against the Welytoks. Similar to *Novak*, the issue here is whether American Standard violated its duty to defend the Welytoks by paying Young the policy limit. *See Novak*, 183 Wis. 2d at 137 (issue before the court was whether insurer's "pay and walk" policy language violated duty to defend).

■

¶ 17.   As we explained in *Novak*, "[t]he duty to defend is a creature of contract." *Id.* "No Wisconsin statute"—including the statute regulating motor vehicle insurance policies—"prescribes a duty to defend or restricts its contractual limitation." *See id.*

■

¶ 18.   While no statute directly prescribes an insurer's duty to defend or restricts its contractual limitation, our case law holds that an insurance company that chooses to limit its duty to defend must notify the insured by placing additional emphasis on the limiting provisions. *See, e.g., id.* at 138–39. Specifically,

with regard to language discharging the insurer's duty to defend upon offering or paying a policy's liability limit, referred to as a " 'pay and walk' " provision, *see id.* at 135–37, we have concluded:

> In order for an insurer to be relieved of its duty to defend upon tender of the policy limits, the ["pay and walk"] language must be highlighted in the policy and binder by means of conspicuous print, such as bold, italicized, or colored type, which gives clear notice to the insured that the insurer may be relieved of its duty to defend by tendering the policy limits for settlement . . . . Insureds will thus be put on notice that they are buying a policy of indemnity and a defense only up to the point where the insurer tenders the policy limits for settlement and that the insurer's duty to defend ceases once such a tender has been made. Once insureds have been given notice by the insurer of a limited duty to defend, they may choose to afford themselves greater protection in the defense of claims by increasing the amount of their policy limits or seek a policy which provides for unlimited defense. Insurers may terminate their duty to defend their insureds by tendering the policy limits, but they may do so only if the insureds receive adequate notice as outlined [above].

*Id.* at 138–39 (emphasis and citation omitted; ellipses in *Novak*).

¶ 19. Turning to the Welytoks' policy, we note that the "pay and walk" provision did give the Welytoks "clear notice," *see id.*, that American Standard could relieve itself of its duty to defend by tendering the policy limits. American Standard's "pay and walk" provision provides:

> **We** will pay compensatory damages an **insured person** is legally liable for because of **bodily injury** . . . due to the use of a car. **We** will defend any suit

or settle any claim for damages payable under this policy as **we** think proper. HOWEVER, **WE** WILL NOT DEFEND ANY SUIT AFTER OUR LIMIT OF LIABILITY HAS BEEN OFFERED OR PAID.

(Bolding and capitalization in policy; some spacing omitted.)

¶ 20.    The policy's "pay and walk" provision highlights the limitation on American Standard's duty to defend by utilizing both bold and capitalized typeface. *See Novak*, 183 Wis. 2d at 138–39. Moreover, its language would not confuse the reasonable person in the insured's position. We cannot imagine how "we will not defend any suit after our limit of liability has been . . . paid" could be communicated more plainly. Indeed, the provision is nearly identical in substance and in form to the provision at issue in *Novak. See id.* at 135–36. Thus, under the plain language of the policy and *Novak*, American Standard's duty to defend was properly terminated upon payout of the policy limits, and summary judgment and dismissal of American Standard from the claim were therefore appropriate.

¶ 21.    Furthermore, we are not convinced that the numerous factual arguments advanced by the Welytoks show that:    (1) *Novak* is distinguishable from the instant case and therefore does not apply; or (2) issues of material fact preclude summary judgment in this case. Specifically, the Welytoks argue that the following factors distinguish *Novak* and/or create issues of material fact.

## A.   *Dispute regarding Young's damages.*

¶ 22.    Specifically, the Welytoks argue that unlike *Novak*, where the claimed damages stemmed from a

152

wrongful death action and therefore were not in dispute, *see id.* at 135, there was an issue regarding whether Young's damages would have actually exceeded the policy limit. In support of this contention, the Welytoks point to the more than $20,000 difference in estimated medical damages in Young's initial demand compared with his later addendum, as well as other factual discrepancies regarding damages.

*B.   American Standard's motivation to settle.*

¶ 23.   According to the Welytoks, American Standard may not have settled with the Welytoks based on a good-faith appraisal of his claims against them, but instead settled based on the desire to avoid costly litigation. The Welytoks argue that under the policy provision, which provided that American Standard would pay all costs incurred in the settlement or defense of any suit *in addition* to the liability limits, American Standard was expressly prohibited from factoring litigation costs into its decision to settle.

*C.   American Standard's lack of communication.*

¶ 24.   According to the Welytoks, American Standard did not communicate the terms of the final settlement and release with them, and did not have their approval to settle the case.[6]

*D.   American Standard's investigation of Young's claim.*

¶ 25.   According to the Welytoks, American Standard failed to properly investigate Young's claim.

[6] *See supra* note 1.

¶ 26. We find each and every one of these arguments unavailing. First, we note that none of the above factors distinguishes the instant case from *Novak*. As explained in more detail above, the two cases are nearly identical. The slight factual differences have no bearing on the issue controlling both cases: whether the insurer properly discharged its duty to defend the insured by paying the policy limits. *See id.* at 134. Second, none of the above factors present an issue of *material* fact that would preclude summary judgment. *See Green Spring Farms v. Kersten*, 136 Wis. 2d 304, 315, 401 N.W.2d 816 (1987) (summary judgment inappropriate when there is no issue of material fact); *see also Metropolitan Ventures, LLC v. GEA Assocs.*, 2006 WI 71, ¶ 21, 291 Wis. 2d 393, 717 N.W.2d 58 (A material fact is one that would influence the outcome of the controversy.). Regardless of the exact amount of Young's damages, American Standard's "true motivations" in paying the policy limit, American Standard's communication (or lack thereof) with the Welytoks, or its investigation (or lack thereof) of Young's claim, the simple and significant fact here is that once American Standard paid Young the $100,000 liability limit, it was allowed, under the clearly written and properly emphasized policy provision at issue here, to discontinue defending the Welytoks against Young's claim. As the trial court deftly observed, the Welytoks "contracted with American Standard to get $100,000 worth of coverage, and how that is spent is how it's spent."

¶ 27. Furthermore, we note that while the Welytoks present the above factors—the same factors it uses to argue for the distinguishing of *Novak* and the creation of material issues of fact—as evidence that American Standard breached its duty of good faith, *see*

*Mowry v. Badger State Mut. Cas. Co.*, 129 Wis. 2d 496, 510–11, 385 N.W.2d 171 (1986) (explaining insurer's duty of good faith), they did not plead a bad faith claim. Therefore, the issue of whether any of the above actions on the part of American Standard constitute bad faith is not properly before us, and we will not consider it. *See State v. Champlain*, 2008 WI App 5, ¶ 17, 307 Wis. 2d 232, 744 N.W.2d 889 ("We generally do not review an issue raised for the first time on appeal.").

¶ 28.   Finally, the Welytoks argue that the trial court's following comments to Daniel Welytok at the summary judgment hearing evince a misapplication of *Novak* and consequently "tainted" its holding, and also "purport[ed] to overrule decades of jurisprudence establishing certain reasonable duties an insurance company owes its insured, including a duty of good faith":

> [THE COURT]:   This case – the facts are right on point with *Novak*. Assuming everything you're saying is true, all your suspicions which you say are facts, your wife's affidavit, which I have reviewed, *Novak* says we will defend the policy limits of $100,000 and it's [American Standard's] decision how [it] pay[s] it out. And then you're asking me to impose an additional burden and, really, you contracted with American Standard to get $100,000 worth of coverage, and how that is spent is how it's spent. There's no duty of good faith.
>
> You contracted for a limit of $100,000. [American Standard] made an analysis and said we're going to pay the hundred thousand dollars. I don't see any greater burden or duty over and above *Novak*. This is exactly on point of the *Novak* case. So I'm granting the summary judgment motion at this time.

¶ 29.   We disagree with the Welytoks' contentions. The trial court's comments support its thoughtful and

155

well-reasoned ruling. The trial court did not purport to do away with American Standard's duty of good faith. As we discussed in more detail above, the trial court was simply explaining that once American Standard paid Young the liability limit of the Welytoks' policy, it no longer had any duty to defend the Welytoks, and that neither the insurance policy nor *Novak* conferred any additional duties upon American Standard.

*By the Court.*—Order affirmed.